

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00049-CR

———————————————

DANIEL ORTIZ, Appellant

V.

THE STATE OF TEXAS

———

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CR2022-1206-1

———

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Daniel Ortiz appeals his three convictions of injury to a child. *See* Tex. Penal Code Ann. § 22.04(a)(2), (e). In three issues, Ortiz argues that the evidence of a "serious mental injury, defect, or deficiency" was insufficient to support his convictions and that the trial court abused its discretion by admitting the State's expert testimony on child torture because the testimony was inadmissible under Rule 702, *see* Tex. R. Evid. 702, and alternatively, because the testimony was "unduly prejudicial," *see* Tex. R. Evid. 403.

We conclude that (1) the evidence supports Ortiz's convictions; (2) the trial court did not abuse its discretion by admitting the expert testimony on child torture over Ortiz's Rule 702 objection; and (3) Ortiz has failed to preserve his Rule 403 complaint for our review. Accordingly, we affirm.

## I. Background

The child victims in this case are Mabel and Harriet, who are twins, and their younger sister Sally (the girls).[1] Mabel and Harriet were born in 2013, and Sally was born in 2014. For part of their childhood, the girls and their mother, who was in a

---

[1]To protect their identities, we use aliases to refer to the victims and their family members. *See* Tex. R. App. P. 9.8 cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

relationship with Ortiz, lived with him at his house.[2] The girls were not related to Ortiz, but they called him "Dad."

When they lived with Ortiz, the girls were often left at home alone. A few months after they moved into Ortiz's house, the girls were taken out of public school and began homeschooling. Ortiz set up surveillance cameras throughout the house, including in the bathroom, and he would use the cameras to "watch" the girls and communicate with them throughout the day. At some point, Ortiz told the girls that they would have to start doing chores.

The girls were given an extensive list of chores that they were required to complete each day. When he was at work, Ortiz would monitor the girls via the surveillance cameras to make sure they did their chores, and when he got home from work, he would question the girls about their chores and check to see if they had been done "right." Some days, Ortiz would approve of the job that the girls had done on their chores. Other days, he accused the girls of lying about doing their chores, or he would determine that they had not done their chores to his satisfaction. Regardless of whether they had actually done their chores, Ortiz would punish the girls.

As punishment, Ortiz would use a belt to hit the girls on their backs, bottoms, legs, and hands. Ortiz would also force the girls to stand in a corner for long periods of time—anywhere from several hours to multiple days. He often used duct tape to

---

[2]It is unclear from the record when the girls and Mother moved in with Ortiz or for how long they lived with him. But when the girls were removed from Ortiz's house—June 2021—they were eight and six years old.

adhere the girls to the wall. Sometimes, Ortiz forced the girls to sit in a chair in the garage and would use duct tape to bind them to the chair, taping around their wrists, ankles, eyes, and mouths. During these punishments, Ortiz would not let the girls use the bathroom; he made them urinate and defecate on themselves. Nor would he let the girls sleep.

After one punishment involving duct tape, Ortiz used a knife to cut the duct tape off Sally's wrist, and in doing so, he cut her wrist. Sally's wrist "was bleeding all over." He told Mother to put alcohol on the wound, which "burned." The injury left a scar on Sally's wrist. Following another punishment in which Ortiz used duct tape, he cut Mabel's wrist with a knife while cutting the duct tape off. Like Sally's injury, Mabel's injury bled a lot, Ortiz put alcohol on it, which "st[u]ng," and the injury left a scar.

Ortiz's would also punish the girls by "drown[ing]" them. He would fill the bathtub with water, make them put their heads into the tub, and use his hand to hold their heads under the water so that they could not breathe. Other times, he would hold their heads face up under the faucet of the bathtub or sink while the water was running, forcing the water to go into their mouths and noses. During this form of punishment, Ortiz would tell the girls that they were going to die. The "drown[ings]" happened multiple times, and on several occasions, Ortiz would "drown" the girls until their noses bled.

In addition to these punishments, Ortiz also spanked the girls; choked the girls; pushed the girls up against the wall; withheld food from the girls; locked the girls in the family's dog kennel; cut or shaved the girls' hair—with Mother's help—to make them look "like a boy" and to humiliate them; and made fun of the girls—again, with Mother's help. When he administered his various forms of punishment, Ortiz would sometimes make the girls strip down to their underwear. Ortiz's punishments left marks, bruises, abrasions, and scars on the girls. The girls were also left with severe emotional trauma.

Eventually, the girls were able to disclose Ortiz's abuse to someone outside of their home. The police began an investigation, and the girls were removed from Ortiz's house in June 2021. The same month, the girls began seeing a licensed professional counselor, who diagnosed the girls with post-traumatic stress disorder (PTSD) resulting from the trauma that they had endured while they lived in Ortiz's house.

Ortiz was arrested and indicted for three counts—one count for each of the girls—of injury to a child for "intentionally and knowingly causing serious mental deficiency, impairment, or injury to [the girls] . . . by engaging in a pattern of mental abuse, psychological humiliation[,] and/or child torture." In January 2024, his case was tried to a jury. The jury heard testimony from several witnesses, including the girls; their grandmother, whom the girls lived with at the time of trial; the counselor who treated the girls when they were removed from Ortiz's house; two other

5

therapists involved in the girls' ongoing treatment; and a forensic psychologist who testified for the State as an expert on the dynamics of child abuse, child torture, and PTSD.

The jury found Ortiz guilty on all three counts and assessed his punishment at fifty years' confinement on each count. The trial court entered its judgments accordingly and ordered the sentences to run consecutively. This appeal followed.

## II. Evidentiary Sufficiency

In his first issue, Ortiz argues that a PTSD diagnosis is insufficient to sustain a conviction for injury to a child with intent to cause a serious mental injury, defect, or deficiency. He contends that the relevant PTSD testimony "did not show present lasting symptoms" that the girls experienced as a result of his alleged actions but showed only "possible symptoms [that] the girls may experience," if any, in the future.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

6

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the

7

indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021).

## B. Applicable Law

Ortiz was indicted for three counts of "intentionally and knowingly caus[ing] serious mental deficiency, impairment, or injury to [the girls] . . . by engaging in a pattern of mental abuse, psychological humiliation[,] and/or child torture." *See* Tex. Penal Code Ann. § 22.04(a)(2), (e). The only question on appeal is whether the evidence was sufficient to establish the element of "serious mental deficiency, impairment, or injury." *See id.* § 22.04(a)(2).

The Texas Penal Code does not define "serious mental deficiency, impairment, or injury." Terms not specifically defined by the legislature are to be given their plain and ordinary meaning. *Edwards v. State*, 666 S.W.3d 571, 575 (Tex. Crim. App. 2023) (first citing Tex. Gov't Code Ann. § 311.011(a); and then citing *State v. Bolles*, 541 S.W.3d 128, 138 (Tex. Crim. App. 2017)). "[J]urors may thus freely read statutory language to have any meaning which is acceptable in common parlance." *Green v. State*, 476 S.W.3d 440, 447 (Tex. Crim. App. 2015).

When determining the sufficiency of the evidence to support a jury's verdict, "an appellate court may articulate a definition of a statutorily undefined, common term." *Kirsch v. State*, 357 S.W.3d 645, 651 (Tex. Crim. App. 2012). The Texas Court of Criminal Appeals has analyzed the undefined statutory phrase at issue here and has articulated the following:

> The statutory phrase at issue here, "serious mental deficiency, impairment, or injury," uses terms with common meanings that are readily understandable by jurors. The meanings of "serious," "mental," and "injury" are so obvious that we need not resort to dictionary definitions. The term "deficiency" by itself means "the quality or state of being deficient," which in turn means "lacking in some necessary quality or element," or "not up to a normal standard or complement." Merriam-Webster's Collegiate Dictionary (11th ed. 2020). "Impairment" means "diminishment or loss of function or ability." *Id.* Webster's Collegiate Dictionary also defines the phrase "mental deficiency" as "a deficiency in cognitive functioning, *specifically*, intellectual disability." *Id.*

*Edwards*, 666 S.W.3d at 575 (footnote omitted).

## C. The Evidence

The jury heard testimony from several witnesses describing the effect that Ortiz's abuse had on the girls. The testimony included expert testimony and lay witness testimony about PTSD and the girls' PTSD diagnoses, as well as treatment records from the counselors and therapists who treated the girls for PTSD.

### 1. The Girls' Testimonies

Each of the girls testified about the "bad things" that Ortiz had done to them or had forced them to do and about how those things made them feel.

During Mabel's testimony, she referred to Ortiz as "the defendant" because she did not like saying his name. She stated that it was hard to talk about Ortiz's abuse. She explained that she would get scared sometimes "when it[ was] too quiet," and she would "always think that somebody like scary [was] watching [her]" while she used the bathroom. Mabel testified that she was in counseling "[t]o help [her] with the past."

9

Her counselor had taught her things that she could do when she was upset or scared, like a breathing technique, which Mabel stated had helped her.

Sally also referred to Ortiz as "the defendant." She testified that she did not like talking about the things that Ortiz had done to her and her sisters. She stated that she was "always scared"; she would get scared thinking that someone was in the room with her when she was sleeping, and whenever she looked at the scar from Ortiz's cutting her, she would remember what happened and feel scared. When asked about the duct tape that Ortiz used to tape her with, Sally stated that she did not want to see any duct tape, that she did not like the smell of it, and that smelling it made her remember the things that had happened to her. She testified that she was in counseling to "help with [her] anger issues."

Harriet testified that anytime she saw someone that looked like Ortiz, smelled like his cologne, or drove a truck like his, she would get scared or upset. Unlike Mabel and Sally, Harriet explained that she liked talking about the things that had happened to her because talking about it made her feel better. She testified that she was in counseling to help with "getting frustrated," to learn coping skills, and to "know that everything that [she had] been through [was] not [her] fault."

**2. Grandmother's Testimony**

At the time of trial—January 2024—the girls lived with their grandmother in Oklahoma. Grandmother testified that the girls had been scared when they came to live with her and that she had to sit in the bathroom with them when they would

10

bathe. While Mabel and Harriet eventually became more comfortable with bathing, Sally did not, and she did not like having water on her face. The girls were afraid of the dark and had issues sleeping; Mabel and Harriet took medication to help them sleep. Harriet would sometimes see a "shadow man," and Mabel had an imaginary friend that "kind of scared" Grandmother. Grandmother explained that the girls had high anxiety at times, and since moving in with her, the girls had had bed-wetting incidents, outbursts of anger, self-esteem issues, and behavioral problems at school.

Grandmother testified that Sally would get upset over the "smallest things." When she got upset, Sally would hit herself and pull her hair. Grandmother had to put childproof knobs on the doors in her home because Sally would try to run away, and she kept sharp objects away from Sally because Sally had "suicidal ideation." Sally had told Grandmother that she wanted to die. One day when Grandmother was driving home, Sally tried to open the door and exit the vehicle while it was moving. Grandmother testified that at one point, Sally had to be placed in an inpatient children's behavioral facility.

Grandmother confirmed that at the time of trial, all three girls were still in therapy.

### 3. Jennyfer Rosado's Testimony

Jennyfer Rosado, a licensed professional counselor, treated the girls for approximately one year before they moved to Oklahoma in June 2022. She testified

11

about the girls' counseling sessions and provided expert testimony about PTSD, particularly children with PTSD.

Rosado had specialized training in treating trauma. She had treated many children who were victims of abuse and who were diagnosed with PTSD, which Rosado described as a post-trauma injury that affects everyday life because the symptoms are ongoing. She testified that PTSD is considered a "brain injury." "[T]here is a shrinking of the hippocampus which is what affects [the person's] memories." When that happens, the person continues to experience a stress response from the injury. She explained,

> [Post-traumatic stress] is a feedback loop that doesn't close. So in the right hemisphere of the brain, we're holding all of these memories in the limbic system, the hippocampus, there is not a timestamp there to say, oh, that happened yesterday and now I can put it back in my memories and move on and recall it when I need to because the brain wants to survive. It's recalled really closely[,] so we're having this response that we don't necessarily know is ever over, and the difference is, it didn't *happen*, it's *happening* which is why I say post-trauma but current symptoms because it continues to happen. [Emphasis added.]

When a traumatic event occurs more than once or is continuous, like repeated emotional and physical abuse, the PTSD becomes more complex. Rosado explained that, in children, this type of trauma affects developmental milestones in the brain and in the body that would normally be seen in children without PTSD. It also significantly increases the risk of suicidal ideations in children.

Rosado testified that PTSD symptoms may be activated by "triggers," which are sensations or visuals that activate the nervous system. The body has biological

12

responses that are identical to the initial trauma, and all the "same memories may come flooding back." Even though the trigger is not the same as the initial trauma, the body "doesn't know that." The triggered person "feel[s] exactly what they felt in those moments that the trauma was occurring." In children with PTSD, triggers are typically behavioral responses. Rosado explained that the child will have issues with school, focus, exhaustion, depression, and anxiety. When presented with a hypothetical situation in which a child had been abused and drowned in a bathtub, Rosado agreed that "[a]nything related to bathing would probably then become generalized in the brain to be a trigger." When presented with another hypothetical situation in which a child had been abused by a specific person, Rosado agreed that things associated with that person—his name, smell, or appearance—could be a trigger.

Rosado testified that PTSD from childhood trauma never goes away. When treating a child with PTSD, Rosado's goal is only to "help teach skills and regulate" so that the child can manage outbursts and the feelings associated with the trauma. But even with treatment, the child will struggle with PTSD for the rest of his or her life. Rosado explained that the symptoms will reemerge during puberty, the child's teenage years, and into adulthood, affecting relationships and attempts at intimacy.

When she began treating the girls, Rosado diagnosed them with "acute" PTSD, which means that the symptoms are "very big . . . . [O]n a scale of zero to ten, ten being the worst[,] acute mean[s] those symptoms are very present, probably closer to a

13

ten if not a ten." Throughout their treatment, the girls exhibited symptoms of PTSD, which Rosado learned of either by her own observations or by reports from the children's home where the girls resided at the time.

Sally would "shut[] down" when she got upset, and she had "behavior management" issues at the children's home. She would cry at night and have bad dreams, and she struggled with impulsive behaviors like pulling her hair, picking at her eyelashes, and purposefully walking into walls. She also suffered from stomach pains, which Rosado explained was a "somatic response" consistent with PTSD. During her counseling sessions, Sally referred to Ortiz as "Voldemort," the villain in the Harry Potter book series. When the girls moved to Oklahoma, Sally was still experiencing acute PTSD. Rosado testified that Sally had consistently connected Ortiz to the trauma that caused her PTSD, that her PTSD was a serious mental injury, and that she would always carry that injury with her.

Harriet also experienced bad dreams, stomach pains, and sadness. Rosado described Harriet as guarded, anxious, and constricted during her counseling sessions. She had issues with emotional regulation and was unable to stay calm and focused during her sessions. During one of her sessions, Harriet indicated that the smell of Ortiz's "perfume" made her think about the "worst things that had happened to her, the scariest things." But unlike Sally, Harriet was more responsive to therapy. When the girls moved to Oklahoma, Harriet's diagnosis had gone from acute PTSD to chronic PTSD, meaning that "her symptoms ha[d] come down from that acute status

14

to a chronic state so they're ongoing but not as intense." Rosado clarified that, although Harriet's PTSD symptoms had improved, her PTSD was a permanent brain injury that would never go away. Rosado testified that Harriet's PTSD was a serious mental injury connected to the trauma caused by Ortiz.

Mabel was engaged but guarded during her counseling sessions. Rosado described Mabel as nervous and anxious. She also experienced stomach pains, sadness, worry, and bad dreams. Rosado testified that Mabel would feel guilt and shame and that she would shut down as a defense mechanism. Mabel had indicated to Rosado that she was scared of Ortiz's returning, that "reminders of him bother[ed her]," and that she did not like bath time or loud noises because "something bad [had] happened." She would "disassociate" at times, and she referred to Ortiz as "Voldemort" during her sessions. Like Harriet, Mabel made progress with Rosado. By the time the girls moved to Oklahoma, the severity of Mabel's PTSD symptoms had reduced from acute to chronic. But Rosado testified that, even with her progress, Mabel's PTSD was a serious mental injury connected to Ortiz's abuse and would never go away.

### 4. Jennifer Stringham's Testimony

When the girls moved to Oklahoma, Sally was admitted to a children's psychiatric unit and received inpatient treatment for approximately one month. Jennifer Stringham was the supervising therapist at the children's psychiatric unit during Sally's treatment. Stringham testified that Sally had been admitted for "crises

15

stabilization" after she had verbalized suicidal ideations. Stringham explained that Sally had been diagnosed with PTSD prior to her admission to the children's psychiatric unit.

**5. Sherry Borden's Testimony**

Sherry Borden, a licensed professional counselor who had training in PTSD and who specialized in "trauma focused cognitive behavioral therapy" with children, testified that PTSD is a diagnosis for people who have experienced or witnessed traumatic events. In children diagnosed with PTSD, the symptoms include flashbacks, nightmares, fear, avoidance, irritability, and emotional numbness. PTSD interferes with the child's relationships, activities, and memories. The child may also be triggered by certain sights, smells, or sounds.

Like Rosado, Borden agreed that PTSD is a brain injury that qualifies as a serious mental injury. Borden explained that a PTSD diagnosis will affect a child for the rest of his or her life and interfere with the way that he or she lives. Borden also explained that the goal of counseling for children diagnosed with PTSD is to teach coping skills and how to work through trauma and reactions to trauma so that the child is prepared to handle triggers as he or she grows older.

When the girls moved to Oklahoma, Borden performed psychological intakes for Mabel and Harriet. She testified that both Mabel and Harriet had exhibited the signs and symptoms of PTSD. After conducting a screening test designed to diagnose PTSD, Borden officially diagnosed Mabel and Harriet with PTSD. She then continued

to treat Harriet as her regular therapist. At the time of trial, Harriet was still being treated by Borden.

Borden described Harriet as "real anxious" during some of her counseling sessions. One of Harriet's PTSD triggers was Ortiz's name. Borden testified that she would use his name during therapy sessions so that Harriet "could get used to the feeling that [his name] brought up." Harriet was also triggered by duct tape and by the smell of the cologne that Ortiz had worn. She did not like talking about Ortiz and was reluctant to disclose his abuse. Borden testified that Harriet would experience PTSD symptoms and have trauma reactions to stressful events for the rest of her life.

**6. Dr. Joann Murphey's Testimony**

Dr. Joann Murphey, a forensic psychologist, testified as an expert in the dynamics of child abuse, child torture, and PTSD. While she had treated several patients throughout her career, Dr. Murphey had never met the girls or reviewed their treatment records.

Like the other experts who testified at trial, Dr. Murphey agreed that PTSD is a serious mental injury, deficiency, or impairment. She also agreed that PTSD is an incurable injury to the brain that will never go away. As an example, Dr. Murphey explained that in 1985, she began treating a patient who had been abused as a child and that the patient, who at the time of trial was in his seventies, continued to see her for his PTSD issues.

17

Dr. Murphey testified that PTSD is a mental injury often caused by child abuse—sexual, physical, and emotional—and that she had treated many patients who had developed chronic PTSD from child abuse. When presented with hypothetical situations describing child abuse similar to the abuse inflicted upon the girls by Ortiz, Dr. Murphey opined that such abuse would cause PTSD, if not "severe" PTSD.

**D. Analysis**

The evidence showed that Ortiz's abuse caused the girls to suffer from PTSD, an injury to the brain from which the girls will continue to suffer for the rest of their lives. Ortiz abused, humiliated, and tortured the girls by isolating them; requiring them to strip down to their underwear for punishments; hitting them with a belt on their backs, bottoms, legs, and hands; choking them; pushing them; forcing them to stand in a corner for long periods of time; duct taping them to a wall or to a chair; putting duct tape on their wrists, ankles, eyes, and mouths; locking them in a dog kennel; denying them access to adequate food, restroom facilities, and sleep; cutting or shaving their hair as punishment; making fun of them; drowning them; and essentially waterboarding[3] them. The effect that Ortiz's actions had on the girls did not end when the abuse ended; the trauma followed the girls long after they were removed from Ortiz's house. The girls dealt with feelings of anger, anxiety, and fear; they did

---

[3]Waterboarding is "an interrogation technique usually regarded as a form of torture in which water is forced into a detainee's mouth and nose so as to induce the sensation of drowning." *Waterboarding*, Merriam-Webster, www.merriam-webster.com/dictionary/waterboarding (last visited Aug. 19, 2025).

not like to say Ortiz's name; they had nightmares and stomach pains; they had trouble sleeping; and they were triggered by things that reminded them of Ortiz or his abuse, such as duct tape and bathing.

The jury heard testimony from the girls, Grandmother, Rosado, Stringham, and Borden regarding the girls' PTSD and treatment. The girls had to go to therapy to work through their trauma and to learn how to cope with the effects of Ortiz's abuse. Rosado diagnosed the girls with PTSD, and Borden later confirmed the diagnosis with Mabel and Harriet. While Dr. Murphey had never met the girls, she opined that child abuse similar to the abuse inflicted upon the girls by Ortiz would likely cause severe PTSD. The severity of Mabel's and Harriet's PTSD symptoms may have improved after a year of treatment, but Rosado clarified that, regardless, Mabel's and Harriet's PTSD symptoms would always be there. The severity of Sally's PTSD symptoms did not improve. At the time of trial, all three girls were still in therapy.

Three expert witnesses—Rosado, Borden, and Dr. Murphey—testified that PTSD is a brain injury that qualifies as a serious mental injury. Further, Rosado, Borden, and Dr. Murphey testified that PTSD never goes away even with the help of therapy. Rosado explained that a child diagnosed with PTSD will continue to struggle with the symptoms of PTSD throughout his or her childhood and into adulthood. Dr. Murphey provided a specific example of an adult patient who had been abused as a child and who she had been treating for decades. Rosado testified that the girls' PTSD, specifically, was a serious mental injury connected to Ortiz's abuse.

From the evidence, the jury could have concluded that the girls suffered from PTSD resulting from the trauma of Ortiz's abuse and that their PTSD qualified as a serious mental deficiency, impairment, or injury. *See Stuhler v. State*, 218 S.W.3d 706, 712–13, 719 (Tex. Crim. App. 2007) (agreeing with appellate court that "evidence was sufficient to establish serious mental injury" when State presented expert testimony from therapist who diagnosed child victim with PTSD and lay witness testimony describing child's behavior after appellant's abuse); *Odem v. State*, No. 13-23-00110-CR, 2024 WL 631479, at *6 (Tex. App.—Corpus Christi–Edinburg Feb. 15, 2024, no pet.) (mem. op., not designated for publication) ("[F]rom the testimony, the jury could have inferred that the complainant [appellant's child] suffered 'serious mental deficiency, impairment, or injury' due to appellant's awareness of and apparent acquiescence to the sexual abuse by [former neighbor], which caused the complainant to suffer PTSD."); *Franco v. State*, No. 13-14-00108-CR, 2016 WL 3389967, at *6, *7 (Tex. App.—Corpus Christi–Edinburg June 16, 2016, no pet.) (mem. op., not designated for publication) (concluding rational factfinder could have found that child victim suffered from PTSD resulting from appellant's "denying [him] access to adequate food . . . [and] restroom facilities . . . [,] forcing [him] to stand for long periods of time, . . . and . . . striking [him] with a . . . belt" and that the child's "mental deficiency, impairment[,] or injury was caused by appellant"); *see also Edwards*, 666 S.W.3d at 577 (noting that in *Stuhler* and *Franco*, the State presented testimony "about the connection between the trauma suffered and the present PTSD diagnosis" and

concluding that, in those cases, "the evidentiary link proving that the physical abuse caused serious mental deficiency, impairment, or injury to the child[ ]victim was established"). Indeed, there was nothing hypothetical or merely "possible" about the girls' trauma, their PTSD diagnoses, or the PTSD symptoms from which they suffered and will continue to suffer for the rest of their lives because of Ortiz. *Cf. Edwards*, 666 S.W.3d at 576 (distinguishing evidence of hypothetical, possible injuries from evidence of actual injuries suffered by child victim).

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that a rational factfinder could have found that Ortiz caused serious mental deficiency, impairment, or injury—namely, PTSD—to the girls. Accordingly, we overrule Ortiz's first issue.

### III. Expert Testimony

In his second and third issues, Ortiz argues that the trial court abused its discretion by allowing Dr. Murphey to testify as an expert on child torture because the testimony was inadmissible under Rule 702, and alternatively, because the testimony was inadmissible under Rule 403.

### A. The Testimony

Dr. Murphey testified that child torture was defined by academic literature as "a longitudinal period of abuse characterized by at least two physical assaults and two or more forms of psychological maltreatment[ and] terror[] or isolat[ion] resulting in prolonged suffering, permanent disfigurement, dysfunction[,] or death." In other

words, child torture involves multiple instances of abuse and psychological maltreatment with intense humiliation and terrorization. Dr. Murphey testified that the period of abuse could be anywhere from months to several years and that the goal of the child-torture perpetrator would be to dominate the child, crush his or her spirit, and restrict his or her access to basic life necessities.

Dr. Murphey explained that child torture was a "relatively small subset" of child abuse; it was a "category" of child abuse like sexual abuse or physical abuse would be a category of child abuse. For example, a child's PTSD diagnosis could be differentiated by which category caused the PTSD, i.e., whether the child had been tortured, sexually abused, or physically injured. For children who had survived child torture, PTSD was the most common mental-health diagnosis.

Dr. Murphey testified that she had treated adults and children who were subjected to child abuse that would qualify as child torture. She was given a hypothetical situation about three children in a house who, for a period of months and at the hands of the person they referred to as "Dad," were constantly monitored by cameras, including in the bathroom; given restricted access to the bathroom; forced to strip to their underwear for punishments; beaten with a belt on their backs, legs, and bottoms; left with bruising, lacerations, and scars; bound with duct tape around their wrists, legs, and eyes; bound to a chair; forced to stand in a corner for several hours or days; drowned in the bathtub; and held face-up under the faucet. Dr. Murphey agreed that such a situation would fit the definition of child torture "[t]o

a T and more" and that the "Dad" in the situation would have complete power over the children. When asked for the basis of her opinion, Dr. Murphey testified that her opinion was "based on [forty-]some-odd years of clinical practice."

## B. Rule 702 Complaint

A trial court has broad discretion to admit expert testimony. *Salazar v. State*, 298 S.W.3d 273, 279 (Tex. App.—Fort Worth 2009, pet. ref'd). We review the trial court's determination as to the admissibility of expert testimony for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). Under the abuse-of-discretion standard of review, we will uphold the trial court's decision as long as it was within the "zone of reasonable disagreement." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). If the trial court's evidentiary ruling is correct on any applicable theory of law, we will not disturb it even if the trial court gave the wrong reason for its correct ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd).

### 1. Rule 702

Rule 702 allows a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if [her] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Under Rule 702, three conditions must be met before expert testimony is admissible: (1) the expert must be qualified; (2) the evidence must be reliable; and (3) the evidence must

be relevant. *Rhomer*, 569 S.W.3d at 669. Here, the only condition at issue is the reliability of Dr. Murphey's testimony.[4]

We consider whether an expert's testimony is reliable by looking at the method she uses to come to her conclusions. *Kingsbury v. State*, 625 S.W.3d 686, 691 (Tex. App.—Fort Worth 2021, no pet.) (citing *Rhomer*, 569 S.W.3d at 672 n.1). We evaluate reliability under one of two tests, depending on whether the testimony involves "hard" science or "soft" science. *Rhomer*, 569 S.W.3d at 671. Hard science refers to evidence derived from a scientific theory, i.e., precise calculations and the scientific method. *See id.* When an expert's testimony is based on a hard science, the expert must satisfy the test set forth in *Kelly*: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. *Id.* (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

---

[4]In the "Summary of the Argument" section of his brief, Ortiz argues that Dr. Murphey did not have "the requisite qualifications in the area of child torture." Later in his brief, Ortiz introduces his Rule 702 argument with, "Testimony presented during the [Rule] 702 hearing did not establish the reliability or relevanc[e] of the testimony." The rest of his argument analyzes whether and concludes that Dr. Murphey's testimony was not based on sound scientific methodology and was thus not reliable. Liberally construing Ortiz's brief, and based on the arguments he presented to the trial court, we determine that he challenges only the reliability of Dr. Murphey's testimony. *See* Tex. R. App. P. 33.1(a), 38.1(i), 38.9; *see also Rhomer*, 659 S.W.3d at 672 n.1 ("Qualification is evaluated by looking at the expert's training and experience. Reliability is evaluated by looking at the method the expert used to come to his conclusions.").

Soft sciences are "the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method." *Kingsbury*, 625 S.W.3d at 691. When an expert's testimony is based on a soft science, the test for reliability asks whether (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999).

Behavioral sciences and psychology are "fields of study outside the hard sciences." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020); *see Kingsbury*, 625 S.W.3d at 703 (concluding that expert's testimony on intimate partner violence was not based on "hard" science); *Wright v. State*, 618 S.W.3d 887, 891 & n.1 (Tex. App.—Fort Worth 2021, no pet.) (listing psychology as example of soft science). Thus, this case should be analyzed under the less stringent *Nenno* test.[5] *See Rhomer*, 569 S.W.3d at 671; *Kingsbury*, 625 S.W.3d at 703; *see also Allison v. State*, 666 S.W.3d 750, 759 (Tex. Crim. App. 2023) (recognizing that soft science expert testimony "is held to a less

---

[5]Ortiz contends that Dr. Murphey's testimony was unreliable because she was "unable to define child torture and [because] the resources [that she] relied upon do not satisfy the *Kelly* factors." However, he then cites the test for reliability under *Nenno*, arguing that those factors have not been satisfied. Although he points us to the *Kelly* factors—the test for reliability when an expert's testimony is based on hard science—Ortiz agrees that the "[e]xpert testimony in the field of psychology is a 'soft science.'"

rigorous standard than hard science expert testimony" and applying *Nenno* analysis to expert testimony based on specialized knowledge of law enforcement, not scientific knowledge); *Coble v. State*, 330 S.W.3d 253, 274 (Tex. Crim. App. 2010) (noting that "'[t]he general principles announced in *Kelly* (and *Daubert*)[6] apply'" when soft sciences are at issue but that the specific factors "'may or may not apply'" and recognizing that the *Nenno* test is "somewhat more flexible" (quoting *Nenno*, 970 S.W.2d at 560)).

### 2. Rule 702 Hearing

Before Dr. Murphey testified at trial, the trial court held a Rule 702 hearing. *See* Tex. R. Evid. 702, 705(b). At the hearing, Dr. Murphey outlined her educational background and training. She had a bachelor's degree in elementary education, a master's degree in guidance and counseling, a PhD in clinical psychology, and a second PhD. She had been an elementary school teacher and became a licensed psychologist in Texas in 1985, focusing her practice on children. Dr. Murphey spent several years assessing and working with "at-risk children," and she had decades of experience evaluating and treating children who had been victims of mental, physical, and sexual abuse. In addition to working with children, Dr. Murphey worked with adults, and she did forensic work.

Dr. Murphey acknowledged that during her testimony, she would be given hypothetical facts and asked to identify patterns related to child abuse, child torture, and PTSD. She agreed that the opinions she would be providing during her testimony

---

[6] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

were based on (1) her training and experience in psychology, including her work with children and victims of abuse and trauma, and (2) academic literature on PTSD and child abuse, including the dynamics of child torture. Dr. Murphey explained that she had unique knowledge in those areas of psychology and that one of her areas of specialty was child victims.

On child torture, specifically, Dr. Murphey testified that the academic literature on child abuse recognized child torture as a subset of child abuse. Specifically, child torture involved "prolonged or repeated" acts of abuse "designed to establish the perpetrator's domination and control over the child's psyche, actions[,] and access to the necessities of life." The academic literature defined child torture as "a longitudinal period of abuse characterized by at least two physical assaults and two or more forms of psychological maltreatment, such as terrorizing or isolati[on] resulting in prolonged suffering, permanent disfigurement, dysfunction[,] or death." Dr. Murphey explained that child torture could be distinguished from other abuse in that abuse "may or may not inflict physical injury" but child torture "inflicts physical injury or the fear that a child is going to die." She described child torture as "a sadistic act toward a child where the child fears for [his or her] life or the lives of others" and the perpetrators of child torture as "a subset of really ill people" who were "sadists." Dr. Murphey testified that she was prepared to analyze hypothetical facts to opine whether those facts were consistent with child torture.

27

On cross-examination, Ortiz asked Dr. Murphey where in the academic literature the definition of child torture could be found, and she responded that it could usually be found under PTSD or together with child abuse. She acknowledged that child torture was a "discrete area" of the recognized literature either because it was not very common or because it was not being reported. When asked about her academic research on child torture, Dr. Murphey stated that she was not an academic and that she had not done her own research. But she explained that there was "an abundance of literature" describing child torture and that she relied on the academic definition of child torture in her practice. Dr. Murphey testified that, as a clinician, it was "really easy" to determine if a child had been a victim of child torture because "[w]e know what torture is."

Ortiz gave Dr. Murphey a hypothetical situation in which a parent punched a child in the face and asked her to explain the point at which such child abuse would rise to the level of child torture. Dr. Murphey testified that it depends on "the degree of pain and . . . the degree of power." For example, a child who had been punched a single time could run away or call 911, whereas a child who had been tortured would not be "allowed to move. That's torture. Complete control, complete giving up all freedoms is torture." Ortiz then questioned Dr. Murphey's ability to identify child torture, and she explained, "Again, . . . [the] child has no control and is at risk of death and the acts are cruel and sadistic." Ortiz asked Dr. Murphey where she had

"learn[ed] that," and she responded that she had spent ten years obtaining her two PhDs and that she had studied it as part of her training.

When asked what she had done to "refresh [her]self" on child torture before providing her opinion in this case, Dr. Murphey explained that she had searched the academic literature and that she had reviewed six to eight articles on child abuse and child torture and had made notes, which she produced for Ortiz's review. She testified that all the articles she had reviewed applied the same or "overlap[ping]" definitions of child torture and provided guidance for identifying child torture.

One of the articles Dr. Murphey reviewed when she was asked to provide her expert opinion in this case was a 2014 publication in "the Journal of Child and Adolescent Trauma" called "Child Torture is a Form of Child Abuse" by Barbara Knox, Nancy Kellogg,[7] Starling, Feldman, and Frasier. The article involved a study of twenty-eight children who had been physically abused, isolated, deprived of basic necessities, terrorized, and neglected. In the article, the authors provided a definition of child torture and proposed "clinical criteria that indicate child abuse by torture." The State subsequently offered the article as an exhibit for purposes of the Rule 702 hearing, and the trial court admitted it.

---

[7]Dr. Murphey testified that Nancy Kellogg was a colleague of hers and had been a recognized expert in the field of child abuse pediatrics for decades. Dr. Murphey also provided the name of another "very well known" expert who studied child torture, Finkelhor.

Ortiz asked Dr. Murphey whether the articles she had reviewed provided the "error rate" in determining what constitutes child torture. She responded that there was not and could not be an error rate because there were no "psychological tests" for identifying child torture, there was no specific diagnosis, and it was not a "law[] of physical science." Multiple times during his cross-examination, Ortiz asked Dr. Murphey about diagnosing child torture, and each time, Dr. Murphey clarified that PTSD was the diagnosis, not child torture. At one point, the State interjected that it was not asking Dr. Murphey to make a diagnosis of child torture, and the trial court told Ortiz to "be careful" with his questions because he was "turning it into a diagnosis of child torture."

On redirect examination, Dr. Murphey confirmed that child torture was not a diagnosis but was a mechanism that could cause PTSD and often resulted in a diagnosis of PTSD. She also confirmed the academic literature's definition of child torture and agreed that child torture was recognized as a subset of child abuse. When asked whether, in her area of expertise, she relied on the academic literature in identifying mechanisms of abuse like child torture, Dr. Murphey responded, "Absolutely."

At the end of the Rule 702 hearing, Ortiz told the trial court that he had no objection to Dr. Murphey's testifying as an expert in child abuse or PTSD, but he objected to her testifying as an expert in child torture "because we haven't been able to define it." He asserted, "I understand it's recognizable literature but just a --

30

reading a few synopses does not satisfy the [*Daubert Kelly*] factors." Ortiz explained that he did not have an issue with Dr. Murphey testifying that the girls had been "tortured" but that it would be "very dangerous" to allow her to "suggest from expert testimony that there [wa]s a discrete subset of PTSD that is child torture." He argued that child torture could not be "reliably explained to the jury . . . . I don't think the[ State has] met that factor with regard to child torture."

The State responded that, again, it was not offering Dr. Murphey's testimony to "say that there [wa]s a subset of PTSD called child[-]torture PTSD" because "a diagnosis of child[-]torture PTSD" did not exist. Rather, the State was offering Dr. Murphey's testimony to explain the dynamics of what academic literature recognized as child torture—a subset of child abuse—and to provide her personal experience in treating patients who had been subjected "to those types of things." Ortiz then acknowledged that the girls had been tortured but argued against Dr. Murphey's "put[ting] a label on it."

Following a brief recess, the trial court overruled Ortiz's objection and permitted Dr. Murphey to testify "as indicated in the [Rule 702] hearing."

### 3. Analysis

Ortiz argues that Dr. Murphey's child-torture testimony was unreliable because she had not "conduct[ed] any of her research" or "publish[ed] any papers" on child torture; her answers to his questions at the Rule 702 hearing were "vague"; she did not provide the source of the definition she gave for child torture until "[t]oward the

31

end of the testimony"; she could not provide an error rate "for diagnosing child torture from PTSD"; she "failed to provide any insight into the field and failed to discuss the diagnosis[8] of child torture"; she did not provide any testimony showing "how she was qualified to discuss child torture"; and her expertise on child torture, according to Ortiz, "boiled down to one sentence [in which] she said, 'I have two PhD degrees.'" We disagree with Ortiz's representation of Dr. Murphey's testimony and conclude that her testimony was reliable under the standard applicable to the soft sciences.

Although child torture is considered a "discrete area" of recognized literature on child abuse, Dr. Murphey demonstrated that the field of expertise is a legitimate one by identifying multiple academic articles—the reliability of which Ortiz has not challenged—and experts that recognized child torture as a subset of child abuse—a field of expertise that Ortiz has not challenged. *See DeLong v. State*, Nos. 2-04-410-CR, 2-04-411-CR, 2006 WL 3334061, at *6 (Tex. App.—Fort Worth Nov. 16, 2006, pet. ref'd) (not designated for publication) (recognizing expert's field of expertise as legitimate based on testimony about peer-reviewed articles published on the subject). And Dr. Murphey is certainly not the first expert in the field of child torture to have testified about the subject in a Texas court. *See, e.g.*, *Calhoun v. State*, No. 06-24-00070-

---

[8]Notably, Ortiz continues to mischaracterize Dr. Murphey's testimony and field of expertise as "diagnosing child torture"—despite multiple clarifications from Dr. Murphey and the State that child torture was not a diagnosis and despite an admonishment from the trial court of the same.

CR, 2025 WL 2046419, at *2 (Tex. App.—Texarkana July 22, 2025, no pet.) (mem. op., not designated for publication) (describing characteristics and phenomena common to child torture); *Flores v. State*, No. 13-22-00596-CR, 2024 WL 4986400, at *4, *5 (Tex. App.—Corpus Christ–Edinburg, Dec. 5, 2024, pet. ref'd) (mem. op., not designated for publication) (noting expert defined child torture as child abuse (1) involving two or more assaults or a single extended assault coupled with psychological maltreatment, rejection, isolation, terrorization and (2) practiced for the purposes of dominance and control); *Garza v. State*, No. 13-22-00599-CR, 2024 WL 4986401, at *4, *5 (Tex. App.—Corpus Christ–Edinburg Dec. 5, 2024, pet. ref'd) (mem. op., not designated for publication) (same); *Franco*, 2016 WL 3389967, at *2 (quoting expert's definition of child torture as "more than just multiple episodes of corporal punishment," including the intentional infliction of physical and psychological pain and suffering on a child, humiliation, isolation, and denial of basic necessities).

The subject matter of Dr. Murphey's testimony—the dynamics of child torture—fell squarely within the scope of that field. Indeed, she was able to offer opinions about what would fit the definition of child torture and what acts of child abuse may rise to the level of child torture based on hypothetical questions derived from the facts of this case. *See Fielder v. State*, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988) ("The fact that [the expert] was able to offer an opinion upon the hypothetical

33

question inferentially established that those hypothetical facts fell within the scope of the [expert's] experience and expertise.").

Dr. Murphey's opinions were based on the similarities between the facts of this case—as presented to her in the form of hypothetical questions—and both the recognized academic literature on child abuse, including the subset of child torture, and her own training and experience in child psychology. Dr. Murphey explained that, as a clinician, it was "really easy" to determine if a child had been a victim of child torture because "[w]e know what torture is." She also identified the academic literature she relied upon in reaching her conclusions and where in the academic literature the definition of child torture could be found.[9] Thus, Dr. Murphey showed that her testimony properly relied on or utilized the principles involved in her field of expertise, i.e., she used her extensive training and experience and her familiarity with the academic literature and relevant studies in the field to opine that the relevant child-abuse facts of this case qualified as child torture. *See Tillman v. State*, 354 S.W.3d 425, 437–38 (Tex. Crim. App. 2011) (discussing, as part of *Nenno*'s third inquiry, the expert's qualifications and concluding that he sufficiently articulated the underlying principles and described his rationale when applying his knowledge to hypothetical scenarios); *see also* Tex. R. Evid. 703 (providing an expert may "base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or

---

[9]Indeed, contrary to Ortiz's assertion, the evidence showed that there was a recognized definition of child torture, and Dr. Murphey was able to provide that definition to the trial court—and did so several times.

personally observed"); *Wells*, 611 S.W.3d at 427 ("Experts are given 'wide latitude' in selecting their foundational sources . . . ." (quoting *Vela v. State*, 209 S.W.3d 128, 135 (Tex. Crim. App. 2006))); *Kingsbury*, 625 S.W.3d at 703 (distinguishing case in which expert "had created his own personal methodology" and "did not know of any . . . books or articles" or of "any studies regarding the accuracy of long-term predictions" in his area of alleged expertise); *cf. Weatherred v. State*, 15 S.W.3d 540, 543 (Tex. Crim. App. 2000) (holding trial court did not abuse its discretion by excluding expert testimony when expert "failed to produce or even name *any* of the studies, researchers, or writings" upon which he claimed to have relied).

The trial court could have reasonably concluded that Dr. Murphey's testimony on child torture was reliable. Accordingly, we conclude that the trial court did not abuse its broad discretion by overruling Ortiz's Rule 702 objection and admitting Dr. Murphey's expert testimony on child torture. We overrule Ortiz's second issue.

## B. Rule 403 Complaint

Ortiz asserts that the child-torture testimony "was unduly prejudicial [because] it put an issue of heightened sensitivity before the jury." *See* Tex. R. Evid. 403. The State contends that Ortiz has failed to preserve his Rule 403 complaint for our review "because he neither made the trial court aware of the complaint nor obtained a ruling." *See* Tex. R. App. P. 33.1(a)(1)(A), (2)(A). Ortiz appears to have anticipated this contention, preemptively arguing in his brief that "[i]t is clear from the record that . . . [he] wanted the [trial] court to exclude testimony regarding child torture"

35

because the testimony was "unduly prejudicial." *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

Ortiz's Rule 403 complaint is based on a purported objection that he asserts he "made during" the Rule 702 hearing. However, he does not identify the objection. From what we can glean from the record and from Ortiz's brief, he appears to refer to the following section of his objection to Dr. Murphey's testimony:

> It sounds like we're saying now that . . . child abuse . . . rises up to what literature says is child torture. I think all of that can be done by just saying . . . [t]hese kids were tortured. But to try to -- I think there's a great danger of unfair prejudice here for an expert to say because a couple of these articles said so, the effects can be even worse. I think a jury can get everything they need just from hearing . . . [Ortiz] did this, and this, and this, . . . and it's horrible and they were tortured. But when we put a label on it, we haven't met those factors [*Daubert* and *Kelly*].

We agree with the State and conclude that Ortiz has failed to preserve his Rule 403 complaint for our review.

**1. Preservation of Error**

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). The record must reflect that the appellant complained to the trial court and either that the trial court ruled on the complaint or that the appellant objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); Tex. R. Evid. 103(a); *Dixon v. State*, 595 S.W.3d 216, 223–

24 (Tex. Crim. App. 2020); *Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018); *Pena*, 353 S.W.3d at 807.

An objection preserves only the specific ground cited. Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1)(B); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g). While no "hyper-technical or formalistic use of words or phrases" is required in order for an objection to preserve an error, the objecting party must still "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (quoting *Pena*, 285 S.W.3d at 464).

### 2. Error Not Preserved

Although Ortiz used the term "unfair prejudice" once during his Rule 702 objection, he did not let the trial judge know that he wanted the child-torture testimony to be excluded under Rule 403 or why he thought he was entitled to exclusion under Rule 403. *See Clark*, 365 S.W.3d at 339. Rather, he let the trial judge know that, while he was, in fact, not opposed to testimony about the girls having been tortured by Ortiz, he did not want Dr. Murphey to "put a label on it" because the *Daubert Kelly* factors had not been met. Nothing in Ortiz's Rule 702 objection indicated that the testimony should have also been excluded under Rule 403 because child torture was "an issue of heightened sensitivity," especially not when Ortiz conceded to lay opinion testimony about what Ortiz had done to the girls—who were

37

barely eight and six years old—and "call[ing] it torture."[10] *See Lumsden v. State*, 564 S.W.3d 858, 898 (Tex. App.—Fort Worth 2018, pet. ref'd) (holding error not preserved when "general [R]ule 403 objection" to exhibit as "unfairly prejudicial to the [d]efendant" was "not specific enough to let the trial judge know why [the defendant] believed that [the exhibit] was not admissible based on [R]ule 403" (first citing *Resendez v. State*, 306 S.W.3d 308, 312–13 (Tex. Crim. App. 2009); and then citing *Checo v. State*, 402 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd))).

The trial court's ruling at the end of the Rule 702 hearing confirms that the trial judge did not know that Ortiz had purportedly made a Rule 403 objection: "After looking at some information on [*Daubert*], I'm going to overrule *the objection* and the witness [will] be allowed to testify as indicated in the [Rule 702] hearing." [Emphasis added.] If Ortiz had intended to raise a Rule 403 complaint in addition to his Rule 702 complaint, he did not do so clearly enough for the trial judge to understand him at a time when the judge was in the proper position to do something about it. *See Clark*, 365 S.W.3d at 339.

Even if Ortiz had sufficiently made the trial court aware of his purported Rule 403 objection, he failed to obtain a ruling on any such objection. *See* Tex. R. App. P.

---

[10]In addition to the section of the Rule 702 hearing quoted above, Ortiz told the trial court, "I think given the allegations in this case, Dr. Murph[e]y can testify and [the prosecutor] can certainly argue that these kids -- *we can call it torture* . . . ." [Emphasis added.]

33.1(a)(2); *Dixon*, 595 S.W.3d at 223. Indeed, the record reflects that the trial court ruled only on Ortiz's Rule 702 objection, with the trial judge referring to "the objection," singular, and to the permissible testimony "as indicated in the [Rule 702] hearing."

Because Ortiz neither presented to the trial court a Rule 403 complaint nor obtained a ruling on any Rule 403 complaint, he has failed to preserve his complaint for our review. *See* Tex. R. App. P. 33.1(a)(1), (2); *Clark*, 365 S.W.3d at 339; *Lumsden*, 564 S.W.3d at 898. Accordingly, we overrule Ortiz's third issue.

## IV. Conclusion

Having overruled Ortiz's three issues, we affirm the trial court's judgments.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 26, 2025